[SUBMITTED WITHOUT ORAL ARGUMENT]

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

No. 20-5056

IN RE HILLARY RODHAM CLINTON AND CHERYL MILLS, *PETITIONERS*

*On Petition for Writ of Mandamus to the*
*United States District Court for the District of Columbia*
*(Civ. Case No. 14-1242)*

## PLAINTIFF-RESPONDENT JUDICIAL WATCH, INC.'S
## RESPONSE TO PETITION FOR WRIT OF MANDAMUS

Paul J. Orfanedes
Ramona R. Cotca
Lauren M. Burke
**JUDICIAL WATCH, INC.**
425 Third Street, S.W., Suite 800
Washington, DC 20024
Tel.:        (202) 646-5172
Email:        porfanedes@judicialwatch.org
             rcotca@judicialwatch.org
             lburke@judicialwatch.org

Dated: April 3, 2020                    *Attorneys for Plaintiff-Respondent*

# CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES

Pursuant to Cir. R. 21 and 28, counsel provides the following information as to parties, rulings and related cases:

**(A)    Parties and Amici**

All parties, intervenors, and amici appearing before the United States District Court for the District of Columbia and in this Court are listed in the Petitioners' Brief for Writ of Mandamus.

**(B)    Ruling Under Review**

Reference to the ruling at issue before this Court appears in the Petitioners' Brief for Writ of Mandamus.

**(C)    Related Cases**

Judicial Watch, Inc. does not believe that there are any related cases within the meaning of Local R. 28(a)(1)(C).

*/s/ Ramona R. Cotca*
Ramona R. Cotca

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................. iii

SUMMARY OF ARGUMENT ..............................................................1

STANDARD OF REVIEW .................................................................1

SUMMARY OF FACTS ....................................................................2

    A.    THE BENGHAZI ATTACK AND RESPONDENT'S INITIAL
         FOIA WORK ........................................................................2

    B.    MEDIA REPORTS ABOUT CLINTON'S EMAILS ........................................4

    C.    RESPONDENT'S FOIA REQUEST AND MOTION FOR
         DISCOVERY ........................................................................6

    D.    NEW FACTS UNCOVERED IN THE DISCOVERY PROCEEDINGS
         RELEVANT TO PETITIONERS' DEPOSITIONS ...........................................9

ARGUMENT ..............................................................................11

    I.    THE COURT SHOULD DECLINE TO ENTERTAIN THE
        PETITION .........................................................................11

    II.    PETITIONERS' RIGHT TO RELIEF IS NEITHER "CLEAR"
        NOR "INDISPUTABLE" .............................................................15

        A.    The Apex Doctrine ........................................................15

        B.    Ordering Clinton's Depositions is Well Within the
           District Court's Discretion ...............................................18

        C.    Ordering Mills' Deposition is Well Within the
           District Court's Discretion ...............................................21

III.   THE DISTRICT COURT DID NOT LACK JURISDICTION TO
        ORDER PETITIONERS' DEPOSITIONS ......................................................24

IV.   THE CASE IS NOT MOOT .....................................................................30

CONCLUSION ........................................................................................................34

CERTIFICATE OF COMPLIANCE

ADDENDUM

        Corporate Disclosure Statement

APPENDIX

        Dkt. 54, Memorandum Opinion (December 6, 2018) ...........................App. 1

        Email produced as part of State Department's February 25, 2020
        supplemental production in *Judicial Watch, Inc. v. Dep't of State*,
        Case No. 15-0687 (includes cited email only) .....................................App. 11

        Email produced as part of State Department's January 8, 2020
        supplemental production in *Judicial Watch, Inc. v. Dep't of State*,
        Case No. 15-0687 (includes cited email only) .....................................App. 14

CERTIFICATE OF SERVICE

## TABLE OF AUTHORITIES

**Cases**                                                                                                **Page(s)**

*Allied Chem. Corp v. Daiflon, Inc.*, 447 U.S. 33 (1980) ...........................................1

*Bush v. Armstrong*, 924 F.2d 282 (D.C. Cir. 1991) ...............................................30

*Cheney v. United States Dist. Ct.*, 542 U.S. 367 (2004)..............................1, 11, 12

*Competitive Enterprise Institute v. Office of Science and Technology*,
    827 F.3d 145 (D.C. Cir. 2016)...............................................................25, 28

*FDIC v. Galan-Alvarez*, 2015 U.S. Dist. LEXIS 130545
    (D.D.C. Sept. 4, 2015) .........................................................................16, 17

*In re Cheney*, 544 F.3d 311 (D.C. Cir. 2008) .......................................2, 12, 14, 17

*In re DOC*, 139 S. Ct. 16 (2018)................................................................................15

*In re Executive Office of the President*, 215 F.3d 20 (D.C. Cir. 2000) ............12, 13

*In re Kessler*, 100 F.3d 1015 (D.C. Cir. 1997) ........................................................14

*In re McCarthy*, 636 F. App'x 142 (4th Cir. 2015) ..................................................15

*In re Papandreau*, 139 F.3d 247 (D.C. Cir. 1998) ......................................12, 13, 14

*Peoples v. U.S. Dep't of Agriculture*, 427 F.2d 561 (D.C. Cir. 1970) ...................16

*In re Sealed Case*, 151 F.3d 1059 (D.C. Cir. 1998) .................................................12

*In re United States*, 624 F.3d 1368 (11th Cir. 2010) ...............................................16

*In re United States*, 542 F. App'x 944 (Fed. Cir. 2013)....................................13, 15

*In re United States*, No. 14-5146, 2014 U.S. App. LEXIS 14134
    (D.C. Cir. July 24, 2014) ......................................................................12, 17

*Judicial Watch, Inc. v. Dep't of State*,
   Case No. 15-cv-00692 (D.D.C.) (APM)..........................................................3

*Judicial Watch, Inc. v. Dep't of State*,
   Case No. 15-cv-00687 (D.D.C.) (JEB)..........................................................32

*Judicial Watch, Inc. v. Dep't of State*,
   Case No. 14-cv-01511 (ABJ) ........................................................................3

*Judicial Watch, Inc. v. Dep't of State*,
   Case No. 13-1363 (EGS) (D.D.C.).................................................................8

*Judicial Watch, Inc. v. Dep't of State*,
   Case No. 13-cv-00951 (D.D.C.) (EGS)..........................................................3

*Judicial Watch, Inc. v. Kerry*, 844 F.3d 952 (D.C. Cir. 2016) ...................29, 30, 31

*Judicial Watch, Inc. v. Pompeo*, 744 F. App'x 3 (D.C. Cir. 2018) .............29, 31, 32

*Kissinger v. Reporters Comm. for Freedom of the Press*,
   445 U.S. 136 (1980)....................................................... 24, 25, 26, 27, 28, 29

*SafeCard Servs., Inc. v. Securities and Exchange Comm'n*,
   926 F.2d 1197 (D.C. Cir. 1991).....................................................................27

*Shepherd v. ABC*, 62 F.3d 1469 (D.C. Cir. 1995) .................................................33

*United States v. Morgan*, 313 U.S. 409 (1941) .......................................................16

*United States v. Sensient Colors, Inc.*,
   649 F. Supp. 2d 309 (D. NJ 2009)................................................................16

*United States v. Wal-Mart Stores*, 2020 U.S. Dist. LEXIS 6929
   (D. Md. March 29, 2002)...............................................................................16

iv

## Statutes

18 U.S.C. § 641 ..................................................................................17

18 U.S.C. § 2071 ................................................................................17

44 U.S.C. § 3106 ................................................................................30

## Other Authorities

*A Review of Various Actions by the Federal Bureau of Investigation
    and Department of Justice in Advance of the 2016 Election*,
    Dep't of Justice OIG, June 2018 (available at
    https://www.justice.gov/file/1071991/download) ............................21, 32, 33

Dep't of State, "*Statement on the Attack in Benghazi*," Sep. 11, 2012
    (available at https://2009-2017.state.gov/secretary/20092013clinton/rm
    /2012/09 /197628.htm) ..................................................................................2

Jonathan Allen, "*Clinton Server Tech Told FBI Of Colleagues' Worries About
    System*," Reuters (available at https://www.reuters.com/article/us-usa-
    election-clinton-emails/clinton-server-tech-told-fbi-of-colleagues-worries-
    about-system-idUSKCN11U0PG)............................................................5, 23

Nikita Vladimirov, "*Clinton Emails Wiped Clean After NYT Story*,"
    The Hill, Sep. 2, 2016 (available at https://thehill.com/blogs/ballot-
    box/presidential-races/294332-clinton-emails-wiped-clean-after-
    nyt-story)....................................................................................................5, 23

*Office of the Secretary: Evaluation of Email Records Management and
    Cybersecurity Requirements*, Dep't of State, Office of Inspector General,
    May 2016 (available at https://www.oversight.gov/sites/default/files/oig-
    reports/esp-16-03.pdf) ................................................................................20

The White House, Office of the Press Secretary,
    "*Statement by the President on the Attack in Benghazi*,"
    Sep. 12, 2012 (available at https://obamawhitehouse.archives.gov/the-press-
    office/2012/09 /12/statement-president-attack-benghazi)................................2

## SUMMARY OF ARGUMENT

Petitioners Hillary Rodham Clinton and Cheryl Mills request the extraordinary remedy of mandamus to reverse the District Court's order permitting their depositions.  Writs of mandamus are exceptionally rare.  "[O]ur cases have answered the question as to the availability of mandamus . . . with the refrain: 'What never?  Well, hardly ever!'" *Allied Chem. Corp v. Daiflon, Inc*., 449 U.S. 33, 36 (1980).  Before the Court can determine whether to entertain a writ, Petitioners must demonstrate that they have no other adequate means of relief. Petitioners fail to make this showing.  Nor do they demonstrate that the District Court's order was a judicial usurpation of power or a clear abuse of discretion, or that Petitioners have a clear and indisputable right to a writ.

## STANDARD OF REVIEW

As one of "the most potent weapons in the judicial arsenal," the Supreme Court has declared that a writ of mandamus is reserved for only the most "exceptional circumstances."  *Cheney v. United States Dist. Ct.*, 542 U.S. 367, 380 (2004).  "Only exceptional circumstances amounting to a judicial 'usurpation of power,' or a 'clear of abuse of discretion . . . will justify the invocation of this extraordinary remedy."  *Id.* (internal citations omitted).  This Court has observed that the "tripartite standard for issuance of the writ is . . . exacting: the right to relief must be 'clear and indisputable;' there must be 'no other adequate means to

- 1 -

attain the relief;' and 'the issuing court, in the exercise of its discretion, must be satisfied that the writ is appropriate under the circumstances.'" *In re Cheney*, 544 F.3d 311, 312-313 (D.C. Cir. 2008).

## SUMMARY OF FACTS

### A.    THE BENGHAZI ATTACK AND RESPONDENT'S INITIAL FOIA WORK.

On September 11, 2012, the 11th anniversary of the September 11, 2001 terrorist attacks, an "Al Qaeda-like group" carried out a pre-planned, terrorist attack on U.S. diplomatic posts in Benghazi, Libya, killing U.S. Ambassador J. Christopher Stevens, U.S. Foreign Service Officer Sean Smith, and two Central Intelligence Agency contractors, Tyrone S. Woods and Glen Doherty. The State Department and the White House immediately downplayed the attack by linking it to an inflammatory YouTube video. The following Sunday, U.S. Ambassador to the United Nations Susan Rice appeared on five television news programs and claimed that the attack was a spontaneous street demonstration against the video, not a pre-planned attack.[1]

---

[1]     Dep't of State, "*Statement on the Attack in Benghazi*," Sep. 11, 2012 (available at https://2009-2017.state.gov/secretary/20092013clinton/rm/2012/09/197628.htm) (accessed 3/27/2020)

The White House, Office of the Press Secretary, *Statement by the President on the Attack in Benghazi*," Sep. 12, 2012 (available at https://obamawhitehouse.archives.gov/the-press-office/2012/09/12/statement-president-attack-benghazi) (accessed 3/27/2020); Dkt. 12, 1-2.

Respondent submitted several Freedom of Information Act ("FOIA")

requests to the Department of State ("State Department" or "State") concerning

both the attack and the government's response.  *See e.g. Judicial Watch, Inc. v.*

*Dep't of State,* Case No. 13-0951 (EGS) (D.D.C.); *Judicial Watch, Inc. v. Dep't of*

*State,* Case No. 15-0692 (APM) (D.D.C.); *Judicial Watch, Inc. v. Dep't of State*,

Case No. 14-1511 (ABJ) (D.D.C.  In response to a request for records in

Ambassador Rice's office, State produced a White House email outlining goals for

Ambassador Rice's television appearances.  Dkt. 12, n. 2; *Judicial Watch*, Case

No. 13-0951 (EGS).  One goal was to "underscore that these protests are rooted in

an Internet video, and not a broader failure of policy."  *Id.*  A "Top-Line" for

Ambassador Rice's appearances was as follows:

> [W]e've made our views on this video crystal clear.  The United
> States government had nothing to do with it.  We reject its message
> and its contents.  We find it disgusting and reprehensible.  But there is
> absolutely no justification at all for responding to this movie with
> violence.

*Id.*

Other records produced by State demonstrated that it was known almost

immediately that the attack was a pre-planned act of terrorism having nothing to do

with the video.  In an 11:11 p.m. email to "Diane Reynolds," an alias used by

Clinton's daughter, on the night of the attack, Clinton wrote:

> Two of our officers were killed in Benghazi by an Al Queda-like (sic)
> group:  The Ambassador, whom I handpicked and a young

- 3 -

communications officer on temporary duty w[ith] a wife and two
young children.  Very hard day and I fear more of the same tomorrow.

Respondent Appendix. ("Res.App.") at 7-8.  Notes of a telephone call between

Clinton and the president of the Libyan General National Congress show Clinton

told the Libyan president – while the attack was still underway and Ambassador

Stevens was still missing – that a terror group had claimed responsibility:  "We've

asked for the Libyan government to provide additional security to the compound

immediately as there is a gun battle ongoing, which I understand Ansar as-Sharia is

claiming responsibility for."[2]  Notes of a September 12, 2012 telephone call

between Clinton and the Egyptian prime minister confirmed, "We know that the

attack in Libya had nothing to do with the film.  It was a planned attack – not a

protest."[3]  Clinton continued: "Based on the information we saw today we believe

the group that claimed responsibility for this was affiliated with al Qaeda."

### B.    MEDIA REPORTS ABOUT CLINTON'S EMAILS.

On March 2, 2015, The New York Times reported that Clinton had used a

personal email account and server to carry out official government business while

---

[2]    State Document C05933131 (available at https://www.judicialwatch.org/wp-content/uploads/2016/04/Defs-Document-Production-March-7-2016.pdf, 3/29/2020).

[3]    *Id.*, State Document C053933132.

she was Secretary of State.  Dkt. 12, 2.  According to the report, the server was

located in the basement of Clinton's Chappaqua, New York home.  *Id.*  It later was

revealed that State Information Technology ("IT") staffer Bryan Pagliano had

maintained the server while Clinton was in office.[4]  On February 1, 2013, Clinton

left office without ensuring that the State Department had access to her work-

related emails.  Clinton retained Platte River Networks to maintain the server after

she left office.[5]

In a March 10, 2015 statement, Clinton announced that, after

communications with the State Department in October 2014, she had instructed her

attorneys, including Mills, to review the emails on the server to determine which

were federal records.  According to the statement, Clinton's attorneys had

determined that 30,490 emails on the server were federal records and 31,830

emails were personal.  Dkt. 12, 2-3.  On December 5, 2014, Clinton's attorneys

had delivered to State twelve bankers boxes containing approximately 55,000

pages of her work-related emails.  *Id.*  Of course, none of these facts had been

---

[4]     Jonathan Allen, *"Clinton Server Tech Told FBI Of Colleagues' Worries About System,"* Reuters (available at https://www.reuters.com/article/us-usa-election-clinton-emails/clinton-server-tech-told-fbi-of-colleagues-worries-about-system-idUSKCN11U0PG, accessed 4/2/2020).

[5]     Nikita Vladimirov, "*Clinton Emails Wiped Clean After NYT Story*," The Hill, Sep. 2, 2016 (available at https://thehill.com/blogs/ballot-box/presidential-races/294332-clinton-emails-wiped-clean-after-nyt-story) (accessed 3/31/2020)

known publicly until the March 2015 statement.  Also not known at the time was that Mills had used a personal Gmail account to email Clinton and other government officials during Petitioners' tenure at State.  *Id.*

### C.    RESPONDENT'S FOIA REQUEST AND MOTION FOR DISCOVERY.

On May 13, 2014, Respondent submitted a FOIA request to State for records in the Office of the Secretary about Ambassador Rice's September 16, 2012 television appearances.  The request sought:

> Copies of any updates and/or talking points given to Ambassador Rice by the White House or any federal agency concerning, regarding, or related to the September 11, 2012 attack on the U.S. consulate in Benghazi, Libya.

> Any and all records or communications concerning, regarding, or relating to talking points or updates on the Benghazi attack given to Ambassador Rice by the White House or any federal agency.

Dkt. 1, ¶ 5.  Respondent filed suit on July 21, 2014, after State failed to respond. *Id.*, ¶¶ 5-9.  The proceedings in the District Court would be marked by two overarching concerns:  (1) the unprecedented nature of Clinton's actions as an agency head; and (2) incomplete, if not false representations to Respondent and the District Court by State and its Justice Department attorneys about Clinton's emails.

On September 15, 2014, the District Court ordered State to produce all non-exempt, responsive records and a draft *Vaughn* Index by November 12 and December 5, 2014, respectively.  Dkt. 9.  The District Court's order anticipated

that the draft *Vaughn* Index would enable the parties to "confer in an attempt to resolve this matter without further litigation."  Dkt. Nos. 8, ¶¶ 3-4; 10.

On November 12, 2014, State made its final production to Respondent.  It produced only four records, all of which had been provided to Respondent earlier, in response to Respondent's request for records in Ambassador Rice's office.  Dkt. 12, 4.  State produced its draft *Vaughn* index on December 5, 2014, the same day Clinton returned approximately 30,000 work-related emails to the agency.  *Id.* Neither State nor its Justice Department attorneys advised Respondent or the District Court that the agency's search, production, and draft *Vaughn* Index did not include Clinton's emails.  Respondent and the District Court only learned of these facts through the March 2, 2015 New York Times report.

Nevertheless, State moved for summary judgment on July 7, 2015.  Dkt. 19. Respondent opposed under Rule 56(d) and requested limited discovery concerning the adequacy of State's search and whether the failure to advise Respondent and the District Court about Clinton's emails constituted bad faith.  Dkt.  22.

The District Court granted Respondent's discovery motion on March 29, 2016.  It found it necessary to develop an:

> understanding of the facts and circumstances surrounding Secretary Clinton's extraordinary and exclusive use of her "clintonemail.com" account to conduct official government business, as well as other officials' use of this account and their own personal e-mail accounts to conduct official government business before the Court can

determine whether the search conducted here reasonably produced all responsive documents.

Petitioners' Appendix ("Pet.App.") A, 1.  It continued:

> The State Department's willingness to now search documents voluntarily turned over to the Department by Secretary Clinton and other officials hardly transforms such a search into an "adequate" or "reasonable" one.  Plaintiff is not relying on "speculation" or "surmise" as the State Department claims. Plaintiff is relying on constantly shifting admissions by the Government and the former government officials.  Whether the State Department's actions will ultimately be determined by the Court to not be "acting in good faith" remains to be seen at this time, but plaintiff is clearly entitled to discovery and a record before this Court rules on that issue.

*Id.* at 2.  Whether the omission of Clinton's emails was in bad faith "remains to be seen, and the factual record must be developed appropriately in order for this Court to make that determination."  *Id.*

Contemporaneous with the District Court's order, another District Judge had authorized limited discovery in an unrelated FOIA case.  *Judicial Watch, Inc. v. Dep't of State*, Case No. 13-1363 (EGS) (D.D.C.).  To avoid overlap with the discovery in Case No. 13-1363 and various government investigations, the District Court delayed ordering discovery until December 6, 2018.  Res.App. at 1, 4-5, 9.  On that date, the District Court authorized discovery to "see if it can rule out egregious government misconduct and vindicate the public's faith in the State and Justice Departments."  *Id.*  It authorized discovery into (1) whether Clinton used a private email to stymie FOIA, (2) whether State's attempts to settle the case in late

2014 and early 2015 amounted to bad faith, and (3) whether State's subsequent searches have been adequate. *Id.* By further order entered on January 15, 2019, the court specified particular discovery Respondent was authorized to undertake. Pet.App. B.

### D. NEW FACTS UNCOVERED IN THE DISCOVERY PROCEEDINGS RELEVANT TO PETITIONERS' DEPOSITIONS.

Respondent's discovery uncovered the following facts relevant to its request for Petitioners' deposition:

1.      State Department Archivist Tasha Thian worked with Petitioners in January 2013 to review procedures for removing personal papers and to provide guidance on records retention. Dkt. 131, 2.

2.      On at least six occasions Clinton was or should have been informed of federal records management protocols, including email retention and compliance responsibilities. Dkt. 144, 5. Clinton "knew we had a process," even before taking office. Dkt. 144-1, 42-44. In December 2008 or January 2009, Clinton had a representative inquire on her behalf about retaining papers that she wanted to bring with her to the agency and taking papers upon her departure. *Id.*

3.      Clinton was briefed personally on the agency's procedures for departing officials in preparation for a meeting between her and former Secretary Henry Kissinger about declassifying his records. Dkt. Nos. 144, 4.

4.      Respondent took the depositions of three senior-level IT officials who were identified by Bryan Palgliano, the State IT staffer who maintained Clinton's server.  Pagliano told the FBI that two of the witnesses raised concerns about Clinton's use of a personal email account and compliance with federal records retention laws in late 2009 or early 2010.  Dkt. Nos. 131, 2, 11-12; 152, 2-3; 152-1.  Pagliano also told the FBI he raised the concerns with Mills and the third official in late 2009 and early 2010.  The officials' testimonies corroborate the information Pagliano had provided to the FBI and confirm that they were aware of Clinton's emails practices in 2009.  *Id.*

5.      In June 2013, FOIA requests related to Clinton's emails became a "concern of focus" for the Office of Information and Program Services ("IPS") when then-IPS Deputy Director John F. Hackett saw a photograph of Clinton using a BlackBerry.  Dkt. 131, 2-3.  Hackett raised concerns with IPS Director Sheryl Walter and Deputy Assistant Secretary Margaret Grafeld.  *Id.*  Thereafter, Thian was tasked with conducting an inquiry into Clinton's BlackBerry and "e-mailing habits."  *Id.*  IPS then issued a directive to stop issuing "No Records" responses to FOIA requests relevant to Clinton's emails.  *Id.*; Tr. Thian Depo., 52-53 (available at https://www.judicialwatch.org/wp-content/uploads/2019/10/JW-v-State-Thain -Deposition-02142.pdf) (accessed 4/2/2020).

- 10 -

6.      Thian testified that she believes agency officials, including those responsible for maintaining records for the Office of the Secretary, intentionally lied about Clinton's email use.  Pet.App. C, 3.

7.      In December 2013 or January 2014, IPS located an email chain from December 24, 2010 in which one State official accidently sent an email containing Clinton's email address to other employees, prompting a second State official to reply, "Be careful, you just gave the secretary's personal email address to a bunch of folks. . . ."  *Id.* at 8.  The first official responded "Should I say don't forward? Did not notice[.]"  *Id.*  The second official replied, "Yeah-I just know that she guards it pretty closely[.]"  *Id.*

Based upon these and other facts developed in discovery, Respondent requested additional, follow-up discovery, including Petitioners' depositions.  Dkt. 131.  The District Court granted Respondent's request on March 2, 2020, after Petitioners were allowed the opportunity to brief the issue fully.  Pet.App. C.

## **ARGUMENT**

## I.   THE COURT SHOULD DECLINE TO ENTERTAIN THE PETITION.

Petitioners pay scant attention to the requirement that, before this Court can exercise its mandamus jurisdiction, they must demonstrate "no other adequate means" of relief – "a condition designed to ensure that the writ will not be used as a substitute for the regular appeal process."  *Cheney*, 542 U.S. at 380.  Petitioners

rely on their status as *former* high-level government officials, but do not offer a single case from this Court or any other, holding that *former* high-level government officials should not be required to follow regular appellate channels to challenge a discovery order.  The three cases they cite, *Cheney*, *supra*, *In re United States*, No. 14-5146, 2014 U.S. App. LEXIS 14134 (D.C. Cir. July 24, 2014), and *In re Cheney*, *supra*, all concerned *sitting* high-level government officials.

The ordinary way to obtain quick appellate review of a discovery order is to disobey it.  *In re Papandreau*, 139 F.3d 247, 251 (D.C. Cir. 1998).  If held in contempt, a litigant then has a final order from which he or she may appeal, asserting any legal flaws in the underlying discovery order.  *Id.*  Mandamus has been recognized as an appropriate shortcut when holding a litigant in contempt would be problematic.  *Id.*  In the governmental context, this has included depositions of *sitting* high-level government officials: *Cheney*, *supra* (sitting vice president); *In re United States*, *supra* (sitting secretary of Agriculture); *In re Cheney*, *supra* (sitting vice president's chief of staff).  It also has included circumstances involving unique claims of confidentiality, privilege, or immunity. *In re Sealed Case*, 151 F.3d 1059 (D.C. Cir. 1998) (grand jury secrecy); *In re Papandreau*, *supra* (sovereign immunity); *see also In re Executive Office of the President*, 215 F.3d 20, 24 (D.C. Cir. 2000) ("absent a viable claim that some important privilege will be infringed if discovery is allowed to proceed, this court

- 12 -

has no jurisdiction to review [an] interlocutory order on this ground"). Petitioners do not assert any unique claim of confidentiality, privilege or immunity. They also do not explain why the availability of mandamus in cases involving *sitting* high-level officials should be extended to cases involving *former* high-level officials. "In the normal course . . . mandamus is not available to review a discovery order." *In re Executive Office of the President*, 215 F.3d at 23.

The reason for treating *sitting* high-level officials differently is to avoid "creat[ing] an occasion for an inter-branch confrontation." *In re Papandreau*, 139 F.3d at 250. As one court has explained, "if the law were otherwise, serious repercussions for the relationship between different branches of government could result if an official was required to place him or herself in contempt to seek immediate review." *In re United States*, 542 F. App'x 944, 947 (Fed. Cir. 2013) (citation omitted). If this concern arises at all in the case of a *former* high-level official, it is at least substantially diminished. Clinton left office in January 2013. Ordering the deposition of a cabinet official who left office seven years ago to obtain information about her email practices does not raise such substantial separation of powers concerns as to render regular appellate review inadequate.

Mills was Clinton's chief-of-staff. Petitioners identify no case in which a court entertained a mandamus petition to stop the deposition of even a *sitting* cabinet member's chief of staff. In *In re Papandreau*, the Court noted its "great

reluctance" to "grant mandamus to vacate orders compelling the testimony of a broad range of executive officials." 139 F.3d at 250-51. It found the prospect raised "severe line-drawing problems." *Id.* at 251. The Court continued, "Dealing with the FDA Commissioner, we declined relief where he failed to offer any principled line that would have placed him above the 350 other appointees at Executive Level IV of the executive establishment." *Id.* (*citing In re Kessler*, 100 F.3d 1015, 1017-18 (D.C. Cir. 1997)). Petitioners identify no principled line that would justify stopping the deposition of a *sitting* cabinet member's chief of staff, much more that of a *former* cabinet member's *former* chief of staff. Moreover, in *In re Cheney*, the Court granted mandamus relief with respect to the deposition of a *sitting* vice president's chief of staff, but in so ruling directed that his deputy be substituted for him as the deponent. 544 F.3d at 312, 314. If the Court can entertain a mandamus petition to stop the deposition of a *sitting* vice president's chief of staff and order that the chief of staff's deputy be deposed in his place, how is the Court to consider such a request by a *former* chief of staff to a *former* cabinet member, where any claim of intrusion on a coequal branch is far more tenuous? Petitioners are silent on the issue.

Simply put, there is no authority for the Court to entertain a mandamus petition to stop the deposition of a *former* cabinet member. It cannot be said that Clinton has "no other adequate means" of relief. She has not even tried to

- 14 -

demonstrate why the ordinary appellate remedy available to every third-party

witness subpoenaed to appear for a deposition is not adequate. As the *former* chief

of staff to a *former* cabinet member, Mills' attempt to invoke the Court's

mandamus jurisdiction is even weaker. The Court should decline to entertain the

petition for both Clinton and Mills.

## II.    PETITIONERS' RIGHT TO RELIEF IS NEITHER "CLEAR" NOR "INDISPUTABLE."

### A.    The Apex Doctrine.

Petitioners invoke the "apex" doctrine to argue that the District Court

committed a clear abuse of discretion in ordering their depositions. They fail to

establish that the doctrine even applies. At a minimum, it is not so obvious that the

doctrine does apply such that Petitioners can claim a "clear and indisputable" right

to relief.

The bulk of the cases cited by Petitioners involve litigants attempting to call

agency heads or high-level officials to testify about official actions in furtherance

of the agencies' performance of their delegated duties. *In re DOC*, 139 S. Ct. 16

(2018) (attempt to depose secretary of Commerce about Census Bureau's inclusion

of a "citizenship" question on the 2020 census); *In re McCarthy*, 636 F. App'x 142

(4th Cir. 2015) (attempt to depose EPA administrator about agency's enforcement

of Clean Air Act); *In re United States*, 542 F. App'x 944 (attempt to depose

Federal Reserve chairman about central bank's bailout of troubled insurance

- 15 -

company AIG); *In re United States*, 624 F.3d 1368 (11th Cir. 2010) (attempt to compel testimony of EPA administrator in lawsuit challenging agency's review of Florida's clean water regulations); *Peoples v. U.S. Dep't of Agriculture*, 427 F.2d 561, 567 (D.C. Cir. 1970) (attempt to depose secretary of Agriculture about agency's administration of the Food Stamp Act); *FDIC v. Galan-Alvarez*, 2015 U.S. Dist. LEXIS 130545 (D.D.C. Sept. 4, 2015) (attempt to depose FDIC chairperson about agency's placement of failed bank into receivership); *United States v. Sensient Colors, Inc.*, 649 F. Supp. 2d 309 (D. N.J. 2009) (attempt to depose EPA administrator in CERCLA action brought by agency); *United States v. Wal-Mart Stores*, 2002 U.S. Dist. LEXIS 6929 (D. Md. March 29, 2002) (attempt to depose CPSC chairman about agency's investigation of allegedly unsafe exercise equipment).

The primary rationale for the "apex" doctrine – that administrative proceedings resemble judicial proceedings and therefore the integrity of the administrative process requires they be as equally respected as judicial decision-making (*see United States v. Morgan*, 313 U.S. 409, 422 (1941)) – cannot be said to apply to Clinton's decision to use a "personal email server" for official government business. That decision bears no resemblance to a judicial or administrative proceeding. Clinton was not adjudicating any administrative claim, enforcing any regulatory mandate, or discharging any duties uniquely delegated to

her or the agency. Clinton's use of a "personal email server" also is not at all analogous to personnel decision at issue in *In re United States*, 2014 U.S. App. LEXIS 14134, in which a sitting agency head was subpoenaed to testify about his decision to fire an agency official who subsequently claimed loss of employment as an injury in a defamation action against third parties. Nor is it analogous to *In re Cheney*, 544 F.3d at 312, in which the sitting vice president's chief of staff was ordered to testify about the Office of the Vice President's construction and application of the Presidential Records Act. Petitioners identify no harm to the "integrity of the administrative process" that is even remotely likely to result if Respondent is allowed to question Clinton or Mills about Clinton's email practices. It is not even clear that Clinton's decision to use a "personal email server" and the subsequent routing of her emails out of the agency when she left office can fairly be characterized as "official action" for purposes of the "apex doctrine." It was more likely a violation of law. *See*, *e.g.*, 18 U.S.C. §§ 641 and 2071.

Another commonly cited rationale – permitting high-ranking officials to perform their duties without disruption or diversion – also plainly does not apply. *Galan-Alvarez*, 2015 U.S. Dist. LEXIS 130545 at * 12. Neither Clinton nor Mills remain in office. There can be no concern that taking their depositions will disrupt or divert them from performing any official duties. *Id.*

Clinton's and Mills' depositions are warranted here because they were directly involved in Clinton's decision to us a "personal email server" to conduct official business and uniquely possess information needed by the District Court to resolve issues raised in this litigation. *Id.*; Pet.App. C, 5-8.

### B.    Ordering Clinton's Deposition Is Well Within the District Court's Discretion.

Clinton points to the existing public record to argue that ordering her deposition is a clear abuse of discretion.  The record is incomplete, however, and only scratches the surface in addressing Clinton's motives and state of mind in using a personal email server to conduct official business, her understanding of State's record management obligations, and her thought process when leaving State with at least 30,000 public records.  Pet.App. C, 7-10.  Prior to seeking Petitioners' depositions, Respondent conducted extensive discovery to try to fill in gaps left in the public record.  Respondent's discovery raised additional questions that the District Court reasonably determined must be answered before it can decide whether State has met its FOIA obligations.  *Id.* at 2.

Tasha Thian, State's Archivist while Clinton was the head of the agency, testified that Clinton would have received briefings about the agency's record management obligations on at least six occasions.  Dkt. 144, 5.  Clinton was personally briefed on these procedures in preparation for a meeting with former Secretary Henry Kissinger about declassifying his records.  *Id.* at 3-4.  Even before

taking office, Clinton "knew we had a process." *Id.* In December 2008 or January 2009, Clinton sent a representative to inquire about retaining papers that she wanted to bring with her to the agency and taking papers with her upon leaving office. *Id.* Thian met personally with the individual and briefed him on the agency's procedures. *Id.* The District Court's questions about Clinton's understanding of her record management obligations in light of this newly discovered evidence is plainly reasonable. Pet.App. C, 7.

The District Court also seeks answers to questions about whether Clinton was aware of the active steps taken to prevent others at State – especially those who worked in records management – from learning about her personal email server. *Id.* at 8. A December 24, 2010 email chain produced in discovery reveals two State officials discussing whether to forward Clinton's emails to other employees because, "I just know [Clinton] guards it closely." *Supra*, 11; Dkt. 144-4. The District Court also was troubled by Thian's testimony that several IT employees may have intentionally withheld information about Clinton's email arrangements. Pet.App. C, 3. It is entirely reasonable for the District Court to want to know whether Clinton was aware of attempts to "keep other State Department employees in the dark" about her email before deciding whether State has satisfied its FOIA obligations. *Id.* at 7-8. The District Court's inquiry into

Clinton's knowledge about State issuing "No Records" responses to FOIA requests for her emails also is reasonable for this same reason. *Id.*; Dkt. 131, 3-4.

The District Court reasonably concluded that Clinton's previous explanations for using a personal email server are cursory, incomplete, and seemingly at odds with what discovery has yielded to date.[6]  Pet.App. C, 7-8. Clinton's assertion that, because her "practice was to e-mail State Department staff on their state.gov accounts," she believed "her e-mail was being captured in the State Department's recordkeeping system," does not answer the questions raised by the discovery taken to date.  Pet. for Mandamus, 20.  To the contrary, it raises the question, why then did she not include her work-related emails on the Form 1904 (Authorization for the Removal of Personal Papers and Non-Record Materials) she completed upon leaving office.  Dkt. 144-3, 5.  She identified other "Electronic Files" she took with her.  *Id.*  Under the circumstances, it plainly was not an abuse of discretion for the District Court to order Clinton's deposition, and Clinton has no "clear and indisputable" right to relief.

---

[6]    It is worth mentioning that neither Clinton nor Mills cooperated with State's Inspector General during the Department's investigation of email practices in the Office of the Secretary.  "*Office of the Secretary: Evaluation of Email Records Management and Cybersecurity Requirements*," Dep't of State, OIG, May 2016, 2,7,38, n. 7,151-52.  (available at https://www.oversight.gov/sites/default/files/oig-reports/esp-16-03.pdf) (accessed 3/30/2020).

## C.     Ordering Mills' Deposition is Well Within the District Court's Discretion.

Mills argues that because she was deposed nearly four years ago in another lawsuit, requiring her to appear for a second deposition in this lawsuit is "duplicate and harassing" and an abuse of discretion.  She offers no authority for this proposition.  She also fails to address the fact that the scope of discovery in this case differs from the scope of discovery in the earlier case.  She ignores the fact that the District Court's order is based on new evidence not available at the time of her May 2016 deposition.

The scope of Mills' deposition in this case is not duplicative of her May 2016 deposition in the other case.  For example, Mills' knowledge of the existence of records about the Benghazi attack was not at issue in the earlier case, which did not concern the attack.  The District Court expressly authorized Respondent to question Mills about her "knowledge of the existence of any emails, documents, or text messages related to the Benghazi attack."[7]  Pet.App., C, 10.  The records were not relevant to the earlier case; they are plainly relevant to this case.

---

[7]     *A Review of Various Actions by the Federal Bureau of Investigation and Department of Justice in Advance of the 2016 Election*, Dep't of Justice OIG, June 2018, 3,119-20,181-82 (a search warrant affidavit for Mills' personal Gmail account was drafted but never filed) (available at https://www.justice.gov/file/1071991/download) (accessed 3/31/2020) (hereinafter "DOJ OIG Report").

In addition, the discovery in this case – obviously taken after Mills' May 2016 deposition – yielded additional, relevant, non-duplicative questions for Mills. For example, when Mills and Clinton's other attorneys reviewed Clinton's emails in late 2014 to identify which were federal records and which were personal records, IPS Deputy Director Hackett insisted that the agency needed Clinton's attorneys to identify the criteria they used to categorize the emails.  Dkt. 131, 5-6. Questioning Mills about Hackett's concerns, the criteria used, and whether she discussed or had an understanding with State officials about the criteria is relevant to this case and non-duplicative of Mills' deposition in the earlier case.

Respondent also took the depositions of three witnesses identified by Bryan Pagliano, a State IT staffer.  Pagliano told the FBI that two of the witnesses, senior-level IT officials, raised concerns about Clinton's use of a personal email server and compliance with federal records retention laws in late 2009 or early 2010.  Dkt. Nos. 131, 2, 11-12; 152, 2-3; 152-1.  Pagliano also told the FBI he raised the concerns with Mills and the third official.  *Id.*  The officials' testimonies corroborate Pagliano's account to the FBI and confirm that they were aware of Clinton's email practices in 2009.  *Id.*  When Respondent deposed Mills in May 2016, the FBI had not yet released its report of Pagliano's interview.  The report was only made public in September 2016, when the FBI concluded its

investigation.[8]  Accordingly, Respondent was not able to question Mills about the officials' concerns or Pagliano's raising their concerns with her.  Questioning Mills about these issues is plainly relevant and will not duplicate questions asked of Mills at her May 2016 deposition.

Mills errs when she claims that Respondent and the District Court incorrectly characterized certain facts as new.  While it may have been known in 2015 that Clinton chose not to keep approximately 30,000 emails her attorneys identified as personal, details about the deletion of these emails were not known until September 2016, when the FBI closed its investigation and released new information about the deletion.[9]  According to the FBI's report of its interview of Paul Combetta, a Platte River Networks employee, Combetta deleted Clinton's emails from the Platte River Networks server on which they had been stored, then used BleachBit, a disk cleaning software, to remove any traces of the emails from the server.[10]  Moreover, he did so after speaking with Mills and despite a congressional subpoena that had been served on Clinton for her Benghazi records. Neither the details nor the timing of the deletion was known when Respondent

---

[8]    Allen, *supra*, n. 4.

[9]    Vladimirov, *supra*, n. 4.

[10]   Combetta's name is redacted from the report.  He was identified in the course of this litigation

- 23 -

deposed Mills in May 2016.  Nor was the conversation with Mills.  They raise

relevant, non-duplicative questions for Mills.

Finally, the District Court's order expressly limits Mills' deposition to

"relevant, non-duplicative questions." Dkt. 161 at 6.  It has already addressed

Mills' concerns.  While Mills may be dissatisfied with the order, she has not

demonstrated that the District Court abused its discretion by issuing it or that she

has a "clear and indisputable" right to relief.

## III.    THE COURT DID NOT LACK JURISDICTION TO ORDER PETITIONERS' DEPOSITIONS.

Citing *Kissinger v. Reporters Comm. for Freedom of the Press*, 445 U.S.

136 (1980), Petitioners claim the District Court lacks jurisdiction under FOIA and

therefore lacks jurisdiction to order discovery because State is not "withholding"

requested agency records.  They largely ignore the substantial factual and legal

issues raised by Clinton's use of a "personal email server" for official business, her

removal of agency records when she left office, and the effect those actions have

on the question of jurisdiction.  The District Court obviously concluded that it

requires Petitioners' depositions and the other discovery it has ordered to answer

the jurisdictional question raised by Clinton's conduct.  By disregarding the need

for this discovery before the District Court can answer the jurisdictional question,

Petitioners' argument puts the cart before the horse.

Federal jurisdiction in a FOIA lawsuit is dependent on a showing that an agency has (1) "improperly"; (2) "withheld"; (3) "agency records." *Kissinger*, 445 U.S. at 150. "Judicial authority to devise remedies and enjoin agencies can only be invoked, under the jurisdictional grant conferred by § 552, if the agency has contravened all three components of this obligation." *Id*. In *Competitive Enterprise Institute v. Office of Science and Technology*, 827 F.3d 145 (D.C. Cir. 2016) ("*CEI*"), the Court held it did not matter that, at the time of a FOIA request implicating an agency head's work-related emails, the emails were held in a private email account. "[A]n agency always acts through its employees and officials. If one of them possesses what would otherwise be agency records, the records do not lose their agency character just because the official who possesses them takes them out the door or because he is the head of the agency." *Id*. at 149. The agency was "withholding" the emails because the agency head controlled them. *Id*. ("If the agency head controls what would otherwise be an agency record, then it is still an agency record and still must be searched or produced."). Here, Clinton left State and took her emails with her. According to Petitioners, the District Court lacks jurisdiction because State cannot "withhold" emails it did not have when Respondent served its FOIA request.[11]

---

[11]     Under *CEI*, if State received a FOIA request for Clinton's emails while she was in office, State clearly would have been obligated to search for and produce non-exempt, responsive emails stored on the server. Of course, State's FOIA

But the question is not so simple. The Court in *Kissinge*r qualified its holding that an agency must have possession or control of records at the time a request is received in order to "withhold" them. *Kissinger*, 445 U.S. at 155 n. 9. "We need not decide whether this standard might be displaced in the event that it was shown that an agency official purposefully routed a document out of agency possession in order to circumvent a FOIA request." *Id*. No such issue was before the Court in *Kissinger*. *Id*.

It is now before the District Court. In fact, the question before the District Court is whether Clinton purposefully routed the entire body of emails she sent and received during her four-year tenure at State, not just one email. Also before the District Court is the question whether she did so to circumvent all FOIA requests concerning her emails, not just a single FOIA request. The reasons the District Court gave for its decision to authorize Clinton's deposition – her state of mind when she decided to set up and use a private server, her awareness of her records management obligations, and her awareness of steps taken to prevent records managers and others from learning about her private server, among others – are directly related to answering these questions.

_____

personnel only would have known about the server if Clinton told them, which is among the questions the District Court seeks to have answered at Clinton's deposition. Pet.App. C, 8-9.

- 26 -

Decisions about what facts a district court needs to answer a legal question before it, whether discovery is necessary to obtain those facts, and the scope of any discovery ordered are well within the district court's discretion. *SafeCard Servs., Inc. v. Securities and Exchange Comm'n*, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (emphasizing a district court's "broad discretion to manage the scope of discovery" in FOIA cases). Petitioners do not argue otherwise. They do not even try to refute the obvious – that the discovery ordered by the District Court is well within its discretion to assist it in resolving the jurisdictional issue. In fact, their only argument regarding jurisdiction appears to be that the District Court was wrong to order Clinton's depositions because Clinton held the server "under claim of right." Petitioners' "claim of right" argument fails for at least two reasons. First, Petitioners compare Clinton to former Secretary Henry Kissinger, who obtained an opinion from State's Legal Advisor advising him that records he wished to remove from State and donate to the Library of Congress "were not agency records but were his personal papers that he would be free to take when he left office." *Kissinger*, 445 U.S. at 140-41. The Court held that, because Kissinger later removed the records from State, the department did not "withhold" them when it subsequently received two FOIA requests for the records. *Id.* "The facts make it apparent that Kissinger, and the Library of Congress as his donee, are holding the documents under a claim of right. Under these circumstances, State cannot be said

to have had possession or control of the documents at the time the requests were received." *Id*. at 155.

The comparison is inapt.  Unlike Kissinger, Clinton did not obtain an opinion from State's Legal Advisor advising her the emails were her personal papers that she was free to take with her when she left office.  *Kissinger*, 445 U.S. at 140-41 and 155.  She also did not donate the emails to the Library of Congress pursuant to a deed that incorporated by reference terms that required the records be "approved for inclusion in the collection" by "authorized officials."  *Id*. at 141-42. In addition, State's Legal Advisor neither provides instructions for reviewing the emails to ascertain the agency's equities in them, nor were such equities taken into account when Clinton removed the emails from the agency.[12]  *Id*. at 142.  Rather, Clinton removed the emails to the basement of her Chappaqua, NY residence, then to an anonymous data center in Secaucus, NJ.  Perhaps most significantly, she did not even advise State that she was taking the records with her when she left office, although a great many high-level agency officials knew about and used the "personal" account to communicate with her.

Second, Petitioners do not argue that Clinton removed the emails under "claim of right."  They argue that she held the server under "claim of right."  The

---

[12]    Under *CEI*, State was obligated to search and produce the emails under FOIA at least as long as Clinton remained in office.  827 F.3d at 149.

distinction is important.  A bank robber who stuffs bills into a duffle bag during a robbery may own the bag, but has no "claim of right" to the stolen cash.  Is Clinton claiming a legal right to the agency records stored on the server?  If so, Petitioners offer no factual or legal support for such a claim.  While the server may have been Clinton's property, the agency records on the server plainly were not.

Finally, Petitioners are wrong when they cite *Judicial Watch, Inc. v. Pompeo*, 744 F. App'x 3 (D.C. Cir. 2018) and *Judicial Watch, Inc. v. Kerry*, 844 F.3d 952 (D.C. Cir. 2016) in support of their jurisdiction argument.  Neither decision has any bearing on jurisdiction.  They do not address whether an agency is "withholding" agency records.  If anything, they stand for the proposition that the Federal Records Act ("FRA") provides a very limited remedy in situations where an agency no longer possesses or controls agency records, *e.g.*, where the agency is not "withholding" the records.  Obviously, Respondent only asserted the FRA claim as an alternative argument to the arguments it raises in the District Court. Regardless, for Petitioners to assert that either decision somehow bears on the jurisdictional question of whether State is "withholding" agency records is a non sequitur.

The District Court plainly seeks to build the record it needs to determine if this case is like *Kissinger* or like the case *Kissinger* expressly declined to decide – a case in which an official purposefully routes agency records outside an agency to

circumvent FOIA.  The District Court determined that it requires testimony from Clinton directly to ascertain her "state of mind" when she chose to use a "personal" email account to conduct official business, then left office and took agency records with her.  Petitioners' argument about the ultimate resolution of the jurisdictional issue the District Court must answer is premature.  Once the depositions and other discovery are completed, the parties can make their jurisdictional arguments and the District Court can rule on whether State "withheld" requested records and, accordingly whether it has jurisdiction to compel State to take further action with respect to Respondent's request.  What is clear, however, is that Petitioners have no clear and indisputable right to prevent the District Court from developing the record it believes is necessary to decide this case.

## IV.    THE CASE IS NOT MOOT.

Claims under FOIA and the FRA are very different, as are the available remedies.  Under the FRA, an agency head who learns of an actual, impending, or threatened unlawful removal or destruction of agency records has "at least a duty to 'ask the Attorney General to initiate legal action.'"  *Kerry*, 844 F.3d at 953-54 (*quoting Bush v. Armstrong*, 924 F.2d 282, 295 (D.C. Cir. 1991)); 44 U.S.C. § 3106(a).  Respondent asked the Secretary of State at the time, John Kerry, to ask the Attorney General to initiate legal action to recover Clinton's emails.  Kerry never responded.  Respondent then filed an FRA lawsuit seeking an order to

compel Kerry to ask. *Kerry*, 844 F.3d at 954. The District Court dismissed the action on mootness grounds, but this Court reversed and remanded. *Id.* at 956.

On remand, the Secretary of State – then Rex Tillerson – argued the suit was moot because the FBI said it had recovered all emails it could reasonably locate and the Attorney General was unlikely to initiate a further effort. *Pompeo*, 744 F. App'x at 3-4.[13] The District Court dismissed again. *Id.* In doing so, however, it found it "plausible" that third parties might retain relevant records, but the Attorney General "has no way to know who those third parties might be." *Id.* at 4. In short, the District Court found the case was moot because the Attorney General was unlikely to initiate an action even if the Secretary of State was ordered to ask him to do so. This Court affirmed. *Id.* at 5.

*Pompeo* did not address the reasonableness of State's search for records responsive to Respondent's FOIA request. Nor did *Pompeo* find there were no more emails for State to locate or that State was not obligated to look for them. It also did not address an agency's FOIA obligations when its head, apparently with the active assistance of top agency officials, conceals, then removes federal records to thwart FOIA. Nor did it address what relief is available to a requester under such circumstances.

---

[13]    In the interim, Mike Pompeo became Secretary of State.

Regardless, subsequent events have proven *Pompeo* wrong.  In January 2020, State produced thirty new Clinton emails in another FOIA lawsuit brought by Respondent, *Judicial Watch, Inc. v. Dep't of State*, Case No. 15-0687 (JEB) (D.D.C.).  At least one email concerns the Benghazi attack.  Res.App. at 12.  Another email strongly suggests that Clinton and Abedin communicated via text message about government business and, accordingly, that their text messages should be searched as well.  *Id.* at15.  When asked by the District Court where and how State located the new emails, its attorney could only say they were located by the FBI:  "Exactly where the FBI got all of those records is something that we're still working on."  Dkt. 156, 36:4-18.  The District Court properly rejected State's arguments to the contrary, finding that the agency "failed to persuade the Court that all of Secretary's recoverable emails have been located" and rejecting its claim that "the Court now has enough information to determine whether State conducted an adequate search . . .  especially when considering State's deficient representations regarding the existence of additional Clinton emails."  Pet.App. C, 2.

The Court in *Pompeo* also did not have the benefit of the DOJ OIG's report on the FBI's Clinton email investigation.[14]  Findings in the report, which was not in

---

[14]    DOJ OIG Report, *supra*, n. 7.

the Court's record, further confirm that the FBI investigation was limited by the fact that it did not obtain a search warrant for Mills' personal Gmail account – although one was drafted – and the review was limited to noncontent information.[15]  The FBI also did not seek to obtain any of Mills' personal devices for Clinton's emails.[16]

Finally, Petitioners ignore the fact that another pending issue is whether State's failure to disclose the Clinton email issue to Respondent or the District Court in late 2014 or early 2015 amounted to bad faith.  Res.App. at 1, 9.  District courts have inherent power to protect their integrity and prevent abuses of the judicial process.  *Shepherd v. ABC*, 62 F.3d 1469, 1474 (D.C. Cir. 1995).  This includes the power to order discovery to determine whether the court's integrity has been harmed or its process abused.  Questioning Clinton about whether she used a private server to evade FOIA may help answer whether State's failure to disclose the Clinton email issue in 2014 or early 2015 harmed the district court's integrity or abused its process.  Petitioners' mootness argument is hardly so "clear and indisputable" as to entitle them to a writ.

---

[15]    *Id.* at 90-91; *supra*, n. 7.

[16]    *Id.*

- 33 -

## CONCLUSION

For the foregoing reasons, this Court should deny Petitioners' petition for a writ of mandamus.

Dated: April 3, 2020                          Respectfully submitted,

                                             */s/ Ramona R. Cotca*
                                             Paul J. Orfanedes
                                             Ramona R. Cotca
                                             Lauren M. Burke
                                             **JUDICIAL WATCH, INC.**
                                             425 Third Street, S.W., Suite 800
                                             Washington, DC 20024
                                             Tel.:        (202) 646-5172
                                             Email:       porfanedes@judicialwatch.org
                                                          rcotca@judicialwatch.org
                                                          lburke@judicialwatch.org

## CERTIFICATE OF COMPLIANCE

The undersigned certifies that this brief complies with the type-volume limitations of Fed. R. App. P. 21(d)(1).  The brief, excluding exempted portions, contains 7,758 words, and has been prepared in a proportional Times New Roman, 14-point font.

Dated:  April 3, 2020                        /s/ *Ramona R. Cotca*
                                             Ramona R. Cotca

                                             *Counsel for Respondent*
                                             Judicial Watch, Inc.

**A D D E N D U M**

## CORPORATE DISCLOSURE STATEMENT

Respondent Judicial Watch, Inc. is a not-for-profit, public interest organization that has no parent company, and no publicly held corporation has a 10% or greater ownership interest in Judicial Watch, Inc.

Dated:  April 3, 2020

/s/ *Ramona R. Cotca*
Ramona R. Cotca

*Counsel for Respondent*
Judicial Watch, Inc.

# A P P E N D I X

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **JUDICIAL WATCH, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | Civil Case No. 14-1242 |
| | ) | |
| **U.S. DEPARTMENT OF STATE,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

### MEMORANDUM OPINION

On his first full day in office, President Obama set a worthy standard for his

administration's compliance with the Freedom of Information Act:

> A democracy requires accountability, and accountability requires transparency. As Justice Louis Brandeis wrote, "sunlight is said to be the best of disinfectants." In our democracy, the Freedom of Information Act (FOIA), which encourages accountability through transparency, is the most prominent expression of a profound national commitment to ensuring an open government. At the heart of that commitment is the idea that accountability is in the interest of the Government and the citizenry alike.

> [FOIA] should be administered with a clear presumption: In the face of doubt, openness prevails. The Government should not keep information confidential merely because public officials might be embarrassed by disclosure, because errors and failures might be revealed, or because of speculative or abstract fears. Nondisclosure should never be based on an effort to protect the personal interests of Government officials at the expense of those they are supposed to serve. In responding to requests under the FOIA, executive branch agencies . . . should act promptly and in a spirit of cooperation, recognizing that such agencies are servants of the public.

> All agencies should adopt a presumption in favor of disclosure to renew their commitment to the principles embodied in FOIA, and to usher in a new era of open Government. The presumption of disclosure should be applied to all decisions involving FOIA.

Freedom of Information Act Memorandum, 74 Fed. Reg. 4683 (Jan. 21, 2009).

APPENDIX 001

But in this case, faced with one of the gravest modern offenses to government transparency, his State and Justice Departments fell far short. So far short that the Court questions, even now, whether they are acting in good faith. Did Hillary Clinton use her private email as Secretary of State to thwart this lofty goal? Was the State Department's attempt to settle this FOIA case in 2014 an effort to avoid searching—and disclosing the existence of—Clinton's missing emails? And has State ever adequately searched for records in this case?

In July 2014, six months after Clinton resigned as Secretary of State, Judicial Watch filed this FOIA suit seeking emails from Clinton and her aides concerning the talking points former U.N. Ambassador Susan Rice used to defend the Obama Administration's response to the attack on the U.S. Embassy in Benghazi, Libya. Compl. ¶ 5, ECF No. 1. And although it would take more than six months for the public to learn Clinton exclusively used a private email account as Secretary, *see* Michael S. Schmidt, *Hillary Clinton Used Personal Email Account at State Dept., Possibly Breaking Rules*, N.Y. Times (Mar. 2, 2015), https://www.nytimes.com/ 2015/03/03/us/politics/hillary-clintons-use-of-private-email-at-state-department-raises-flags.html, department officials already knew Clinton's emails were missing from its records. *See* Rachel Bade, *State Made Earlier Request for Clinton to Hand Over Emails*, Politico (Feb. 16, 2016, 5:32 PM), https://www.politico.com/story/2016/02/hillary-clinton-emails-state-219341.

State played this card close to its chest. In November 2014, State told Judicial Watch it performed a legally adequate search and concluded settlement was appropriate, despite knowing Clinton's emails were missing and unsearched. 10/12/18 Tr. 14:2-7, ECF No. 53. In December 2014—the same day Clinton quietly turned over 55,000 pages of her missing emails—State gave Judicial Watch a draft *Vaughn* index making no mention of the unsearched records. *See* 5/1/15

2

APPENDIX 002

Status Report ¶ 3, ECF No. 16. Judicial Watch declined to take State's word for it, requesting a

search declaration. *See* 5/1/15 Status Report ¶ 3. A few weeks later, State filed a status report

with this Court that failed to acknowledge the unsearched emails but suggested it was "possible

to . . . settle this case." 12/31/14 Status Report ¶ 3, ECF No. 10. After another month of radio

silence—by then, at least three months after State realized it never searched Clinton's emails,

and two months after Clinton gave the Department 30,490 of the 62,320 emails recovered from

her private server (she deleted the rest)—State filed another status report admitting "additional

searches for documents potentially responsive to the FOIA must be conducted" and asking for

two months to conduct these searches. 2/2/15 Status Report ¶ 3, ECF No. 11. A month later,

Judicial Watch read the *New York Times* and realized what State was talking about. *See* Pl.'s

Mot. Status Conf. ¶ 3, ECF No. 13. That story, along with reporting that Clinton's former Chief

of Staff Cheryl Mills and former Deputy Chiefs of Staff Huma Abedin and Jake Sullivan also

used personal email to conduct government business, *see* Pl.'s Mot. Status Conf. ¶ 3; Michael S.

Schmidt, *In Clinton Emails on Benghazi, Rare Glimpse at Her Concerns*, N.Y. Times (Mar. 23,

2015), https://www.nytimes.com/2015/03/23/us/politics/in-clinton-emails-on-benghazi-a-rare-

glimpse-at-her-concerns.html, exposed State's deceit in this case.

    At best, State's attempt to pass-off its deficient search as legally adequate during

settlement negotiations was negligence born out of incompetence. At worst, career employees in

the State and Justice Departments colluded to scuttle public scrutiny of Clinton, skirt FOIA, and

hoodwink this Court.

    The current Justice Department made things worse. When the government last appeared

before the Court, counsel claimed "it's [not] true to say we misled either Judicial Watch or the

Court." 10/12/18 Tr. 15:6-8. When accused of "doublespeak," counsel denied vehemently,

APPENDIX 003

feigned offense, and averred complete candor. 10/12/18 Tr. 16-17. When asked why State masked the inadequacy of its initial search, counsel claimed that the officials who initially responded to Judicial Watch's request didn't realize Clinton's emails were missing, and that it took them two months to "figure[] out what was going on" after the former-Secretary-turned-presumptive-presidential-candidate delivered twelve bankers boxes of emails. 10/12/18 Tr. 14:7-11. When asked why it took so long for State to own-up to the missing emails and to its initial search's deficiency, counsel cited "normal FOIA practice." 10/12/18 Tr. 41:21-22; *see also* 5/1/15 Status Report at 6, ECF No. 16 (calling this "a run-of-the-mill FOIA dispute").

Counsel's responses strain credulity. And even before this recent chicanery, the Court found enough signs of government wrongdoing to justify discovery, including into whether Clinton used her private email to intentionally flout FOIA. *See* 3/29/16 Mem. & Order, ECF No. 39. But the Court put-off setting a specific discovery order, mindful of parallel proceedings before Judge Sullivan, *see Judicial Watch, Inc. v. Dep't of State*, No. 13-1363, and ongoing investigations by State's Inspector General, the Federal Bureau of Investigation, and the House Select Committee on Benghazi. Since those inquiries concluded, the Court now orders the parties to meet and confer to develop a discovery plan into whether Clinton used a private email to stymie FOIA, whether State's attempts to settle the case despite knowing its initial search was inadequate amounted to bad faith, and whether State's subsequent searches have been adequate.

## I. DISCUSSION

With the government investigations concluded and discovery before Judge Sullivan winding down, Judicial Watch sought to verify the adequacy and good-faith of State's search in this case with requests for production and depositions bearing on State's responses to other inquiries. *See* Pl.'s Notice, ECF No. 50. For its part, State argued discovery is unnecessary

4

because of the discovery before Judge Sullivan and the additional information made public since March 2016. *See* Def.'s Notice, ECF No. 51. Today the Court orders the parties to develop a discovery plan limited to three issues: whether Clinton used a private email to evade FOIA, whether State's attempts to settle the case despite knowing the inadequacy of its initial search constituted bad faith, and whether State's subsequent searches for responsive records have been adequate.

Although "[d]iscovery in FOIA is rare," *Baker & Hostetler LLP v. Dep't of Commerce*, 473 F.3d 312, 318 (D.C. Cir. 2006), "[t]he major exception . . . is when the plaintiff raises a sufficient question as to the agency's good faith in processing documents." *Landmark Legal Found. v. E.P.A.*, 959 F. Supp. 2d 175, 184 (D.D.C. 2013) (quoting U.S. Dep't of Justice, Guide to the Freedom of Information Act 812 (2009)). In these cases, discovery verifies the government adequately searched for responsive records. *See Weisberg v. Webster*, 749 F.2d 864, 868 (D.C. Cir. 1984).

But in an even rarer subset of these cases, the government's response to a FOIA request smacks of outrageous misconduct. And these cases merit additional discovery into the government's motives. *E.g.*, *Judicial Watch, Inc. v. Dep't of Commerce*, 34 F. Supp. 2d 28, 41 (D.D.C. 1998); *see DiBacco v. U.S. Army*, 795 F.3d 178, 192-93 (D.C. Cir. 2015); *cf. Flowers v. I.R.S.*, 307 F. Supp. 2d 60, 71 (D.D.C. 2004).

This is one of those cases. The Court takes no pleasure questioning the intentions of the nation's most august executive departments. But it still remains unknown whether Clinton used a private email to duck FOIA requests. Indeed, that is the focus of the remaining discovery before Judge Sullivan. *See* Mem & Order, *Judicial Watch v. U.S. Dep't of State*, No. 13-1363, at 12 (D.D.C. May 4, 2016), ECF No. 73. State makes much of former FBI Director James Comey's

APPENDIX 005

response when Congressman Ron DeSantis asked if Clinton used her private email to flout

FOIA: "I can't say that. Our best information is she set it up as a matter of convenience." *See*

Def.'s Notice Prop. Order 10, ECF No. 51 (citing *Oversight of the State Department: Hearing*

*Before the H. Comm. on Oversight & Gov't Reform*, 114th Cong. 20 (2016)). But that's not quite

the full-throated refutation State makes it out to be. Rather, telling Congress—under penalty of

perjury—what he couldn't say for sure was an understandably equivocal assessment of the

evidence at the time. It was not a conclusive repudiation of what many people familiar with the

Presidential Records Act have long wondered. Take the very first public story about Clinton

using a private email for official business, long before the public knew its extent: When an easily

overlooked March 2013 hack of Clinton-confidante Sidney Blumenthal's AOL account exposed

an official email from Clinton's private account, a *Gawker* article speculated it was a one-off

"attempt to shield her communications with Blumenthal from the prying eyes of FOIA

requesters." John Cook, *Hacked Emails Show Hillary Clinton Was Receiving Advice at a Private*

*Email Account from Banned, Obama-Hating Former Staffer*, Gawker (Mar. 20, 2013, 3:39 PM),

http://gawker.com/5991563/hacked-emails-show-hillary-clinton-was-receiving-advice-at-a-

private-email-account-from-banned-obama-hating-former-staffer. Or take Abedin's response

when State's Executive Secretary suggested Clinton use a government Blackberry so her email

"would be subject to FOIA requests": "doesn't make a whole lot of sense." E-mail from Huma

Abedin to Stephen D. Mull & Cheryl D. Mills (Aug. 30, 2012, 5:17 PM), *appended to* Pl.

Judicial Watch's Reply Supp. Mot. Disc., *Judicial Watch, Inc. v. U.S. Dep't of State*, No. 13-

1363 (D.D.C. Jan. 22, 2016), ECF No. 51-3. Even more telling is the State Department Inspector

General's conclusion that although dozens of department officials emailed Clinton's personal

account, the employees responsible for FOIA compliance didn't know the account existed.

Office of Inspector Gen., Evaluation of the Department of State's FOIA Processes for Requests

Involving the Office of the Secretary 14-15 (2016), https://www.stateoig.gov/system/files/esp-

16-01.pdf.

Nor can the Court blame Judicial Watch for questioning whether State's attempts to settle

the case while knowing it had not searched Clinton's missing emails—and continuing after State

recovered the emails—was an intentional effort to block their release. Especially since State's

counsel came close to admitting as much at the Court's last hearing. Counsel averred there was

nothing wrong with State's attempt to pass-off its initial search as legally adequate since, "at the

time," the Department believed "items not in State's possession d[id] not need to be searched."

10/12/18 Tr. 16:11-16. That admission is significant for two reasons: Factually, it implies State

thought settling this case would absolve the Department of any duty to search Clinton's missing

emails in response to this request. And legally, it is wrong. Though agencies need not

retrospectively search records they failed to retain, *e.g.*, *SafeCard Servs., Inc. v. S.E.C.*, 926 F.2d

1197, 1201 (D.C. Cir. 1991), agencies violate FOIA when they fail to search records an

employee improperly secreted from the agency's control. *Judicial Watch, Inc. v. U.S. Dep't of

Commerce*, 34 F. Supp. 2d 28, 42-44 (D.D.C. 1998); *see also Kissinger v. Reporters Comm. for

Freedom of the Press*, 445 U.S. 136, 159 (1980) (Brennan, J., concurring in part and dissenting

in part) (noting the majority's suggestion "that an agency would be improperly withholding

documents if it failed to take steps to recover papers removed from its custody deliberately to

evade an [sic] FOIA request").

Did State know Clinton deemed the Benghazi attack terrorism hours after it happened,

contradicting the Obama Administration's subsequent claim of a protest-gone-awry? *See* E-mail

from H, hrod17@clintonemail.com, to Diane Reynolds (Sept. 11, 2012, 11:12 PM),

APPENDIX 007

https://benghazi.house.gov/sites/republicans.benghazi.house.gov/files/documents/
Tab%2050.pdf; *see also* Nick Gass, *Chelsea Clinton's Secret Identity*, Politico (Mar. 5, 2015,
7:57 AM), https://www.politico.com/story/2015/03/chelsea-clinton-diane-reynolds-secret-email-
115786 (establishing Diane Reynolds as an email pseudonym for Chelsea Clinton). Did State
know Clinton sent or received top-secret information through her private email? *See* Statement
by FBI Director James B. Comey on the Investigation of Secretary Hillary Clinton's Use of a
Personal E-Mail System (July 5, 2016), https://www.fbi.gov/news/pressrel/press-
releases/statement-by-fbi-director-james-b-comey-on-the-investigation-of-secretary-hillary-
clinton2019s-use-of-a-personal-e-mail-system (noting the FBI recovered eight email chains from
Clinton's server containing top-secret information). Did the Department merely fear what might
be found? Or was State's bungling just the unfortunate result of bureaucratic redtape and a
failure to communicate? To preserve the Department's integrity, and to reassure the American
people their government remains committed to transparency and the rule of law, this suspicion
cannot be allowed to fester.

Nor is the government correct that Judicial Watch's proposal mimics information already
made public. As the government acknowledged at the recent hearing, Judicial Watch's request
extends to all Office of the Secretary employees. *See* 10/12/18 Tr. 19:3-6, 36:22-24. And
according to State's Obama-era website, that includes not only the Secretary, her chief of staff,
and her deputy chief of staff, but also her secretary, executive assistant, two special assistants,
scheduler, staff assistant, and two personal assistants. *See Bureaus/Offices Reporting Directly to
the Secretary*, U.S. Dep't St., https://2009-2017.state.gov/s/. To be sure, the government's
investigations and scores of lawsuits examined the emails Clinton turned over to State, *e.g.*,
*Leopold v. Dep't of State*, No. 15-123 (Contreras, J.), the thousands more the FBI resurrected by

8

APPENDIX 008

forensically searching Clinton's private server, *e.g.*, *Leopold v. Dep't of Justice*, No. 15-2117

(Moss, J.), and the thousands more the FBI recovered during an unrelated investigation into

Anthony Weiner. *E.g.*, *Judicial Watch, Inc. v. Dep't of State*, No. 15-684 (Howell, J.).[1] But State

does not identify any comparable examination of records from other Office of the Secretary

members. In fact, State even concedes it has yet to search emails Mills, Abedin, and Sullivan

turned over in August 2015. *See* Def.'s Notice Prop. Order 2 n.1. Moreover, the Court is unaware

of any public information shedding light on State's attempts to settle this case in late 2014 and

early 2015. And though the parties must avoid duplicating the discovery already taken before

Judge Sullivan into Clinton's motives, prior discovery before another judge does not per se

preclude additional evidence discoverable under this Court's independent judgment.

## II. CONCLUSION

To see if it can rule out egregious government misconduct and vindicate the public's faith

in the State and Justice Departments, the Court orders the parties to meet and confer to plan

discovery into whether Clinton used a private email to stymie FOIA, whether State's attempts to

settle the case in late 2014 and early 2015 amounted to bad faith, and whether State's subsequent

searches have been adequate. The parties are to submit a proposed plan and schedule for

discovery within ten days. Once discovery ends, the Court will determine the adequacy of State's

---

[1] The FBI's efforts were imperfect, since the FBI could not recover all the emails Clinton deleted. When last appearing before the Court, State strained to transplant into this case another court's conclusion under the Federal Records Act "that the FBI has exhausted all imaginable investigative avenues" to recover still-missing emails. *Judicial Watch, Inc. et al. v. Tillerson*, 293 F. Supp. 3d 33, 31 (D.D.C. 2017) (Boasberg, J.). Taking no position on the merits of that conclusion, the Court notes first that the Federal Records Act employs a very different standard than FOIA, requiring agencies take only more-than-minimal action to remedy federal record removal or destruction, *see Judicial Watch, Inc. et al. v. Tillerson*, 156 F. Supp. 3d 69, 76 (D.D.C.) (Boasberg, J.) (citing *Armstrong v. Bush*, 924 F.2d 282, 296 (D.C. Cir. 1991)), *rev'd & remanded on other grounds*, 844 F.3d 952 (D.C. Cir. 2016), and second that Judicial Watch appealed the decision to the D.C. Circuit, which heard argument last month. *Judicial Watch, Inc. v. Pompeo*, No. 17-5275.

APPENDIX 009

searches and set a further schedule for the submission of *Vaughn* affidavits and dispositive

motions. An accompanying order follows.


Date: December __6__, 2018

Royce C. Lamberth
United States District Judge

APPENDIX 010



**United States Department of State**

*Washington, D.C.  20520*

February 25, 2020

Case No. F-2015-05048
Segment: FBI-0001

Kate Bailey
Judicial Watch
425 Third St. SW. Suite 800
Washington, DC 20024

Dear Ms. Bailey:

I refer to our letter dated January 8, 2020 under the Freedom of Information Act (the "FOIA"), 5 U.S.C. § 552. The Department of State has completed its review of 11 additional records referred to us by the Federal Bureau of Investigation. After reviewing these records, we have determined that all 11 may be released in part.

An enclosure explains the FOIA exemptions and other grounds for withholding material. Where we have made excisions, the applicable FOIA exemptions are marked on each document. All non-exempt material that is reasonably segregable from exempt material has been released in the enclosed pages.

This release concludes the processing of your request. If you have any questions, please contact Stephen Pezzi, Trial Attorney, at (202) 305-8576 or stephen.pezzi@usdoj.gov. Please refer to Civil Action Number 15-cv-00687 and FOIA case number F-2015-05048 in all correspondence regarding this case.

Sincerely,

Susan C. Weetman
Deputy Director
Office of Information Programs and Services

Enclosures: As stated

APPENDIX 011

**RELEASE IN PART**
**B5,B6**

| | | |
|---|---|---|
| **From:** | Barnett, Robert ‹_____› | B6 |
| **Sent:** | Saturday, October 13, 2012 10:42 AM | |
| **To:** | Sullivan, Jacob J; Sullivan, Jacob J | |
| **Subject:** | Fw: Idea | |

Long time. I miss you. I welcome your suggestion as to how best to answer this. It is coming. We start at

----- Original Message -----
From: H [mailto:HDR22@clintonemail.com]
Sent: Saturday, October 13, 2012 10:16 AM
To: Barnett, Robert
Subject: Re: Idea

I appreciate your following up.

Also, Jake and I were discussing the Benghazi security issue since he tried to tell [_____] would be asked about it    B5
but they didn't think so. Might be good for you to call Jake too.

----- Original Message -----
From: Barnett, Robert [mailto:[_____]    B6
Sent: Saturday, October 13, 2012 10:08 AM
To: H
Subject: Re: Idea

We spoke. Thank you.

----- Original Message -----
From: H [mailto:HDR22@clintonemail.com]
Sent: Saturday, October 13, 2012 07:47 AM
To: Barnett, Robert
Cc: 'pennrhodeen[_____]    B6
Subject: Idea

Bob--

A friend of mine, Penn Rhodeen, copied above, has an idea about how to discuss the 47% remark and asked me if I could
give him a contact who could pass it on.

So, I'm connecting the two of you and wishing all of us a good debate!

Onward-----H

NOTICE:

This message is intended for the use of the individual or entity to which it is addressed and may contain information that
is privileged, confidential and exempt from disclosure under applicable law. If the reader of this message is not the
intended recipient or the employee or agent responsible for delivering this message to the intended recipient, you are
hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have

1

received this communication in error, please notify us immediately by reply or by telephone (call us collect at (202) 434-5000) and immediately delete this message and all its attachments.


NOTICE:

This message is intended for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If the reader of this message is not the intended recipient or the employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by reply or by telephone (call us collect at (202) 434-5000) and immediately delete this message and all its attachments.

APPENDIX 013



**United States Department of State**

*Washington, D.C. 20520*

January 8, 2020

Case No.: F-2015-05048
Segment: FBI-0001

Ms. Kate Bailey
Judicial Watch
425 Third St. SW, Suite 800
Washington, DC 20024

Dear Ms. Bailey:

I write in response to your request dated March 4, 2015, under the Freedom of Information Act (the "FOIA"), 5 U.S.C. § 552. The Department of State has completed its review of 13 additional records referred to us by the Federal Bureau of Investigation. After reviewing these records, we have determined that 2 may be released in full and 11 may be released in part.

An enclosure explains the FOIA exemptions and other grounds for withholding material. Where we have made excisions, the applicable FOIA exemptions are marked on each document. All non-exempt material that is reasonably segregable from exempt material has been released in the enclosed pages.

The processing of your request remains ongoing. If you have any questions, your attorney may contact Stephen Pezzi, Trial Attorney, at (202) 305-8576 or at stephen.pezzi@usdoj.gov. Please refer to Civil Action Number 15-cv-00687 and FOIA case number F-2015-05048 in all correspondence regarding this case.

Sincerely,

Susan C. Weetman

Susan C. Weetman
Chief, Program and Policies Division
Office of Information Programs and Services

Attachments: As stated.

UNCLASSIFIED U.S. Department of State Case No. F-2020-00151 Doc No. C06859804 Date: 01/08/2020

**RELEASE IN PART**
**B7(E)**

| | |
|---|---|
| **From:** | "Abedin, Huma" <SBUSTATE/SES/RECIPIENTS/ABEDINH> |
| **Sent:** | 8/31/2011 2:24:35 PM +00:00 |
| **To:** | 'hdr22@clintonemail.com' |
| **Subject:** | Re: Report: Philippines lashes out at ex-US envoy (AP) |

Sorry I had 2 lines going at once with paris. We have a couple new issues that we are working through. As you know countries are being added left and right with berlusconi being latest addition. And more heads of state as opposed to FM adding.

Movers should be gone by 1pm so might be easiest anytime after 1pm.

Sent you a couple text messages

- for tonite, if you could be wheels up by 9pm from westhampton, would be great. Plane will be ready from 8:15pm

- aiming for 10pm wheels up from andrews. Puts us wheels down at 11am tomorrow and as you know, we are trying to jam a lot in.

- Ill meet you at andrews unless you want me to send monica to hamptons to help you get organized? Mark brandt will be on little plane in case there are issues

**From**: H [mailto:hdr22@clintonemail.com]
**Sent**: Wednesday, August 31, 2011 10:29 AM
**To**: Abedin, Huma
**Subject**: Re: Report: Philippines lashes out at ex-US envoy (AP)

I tried your cell. Ut got vm. Can we set a time.

Sent from my iPad

On Aug 31, 2011, at 8:36 AM, "Abedin, Huma" <AbedinH@state.gov> wrote:

    In dc. Can talk anytime.

**From**: H [mailto:hdr22@clintonemail.com]
**Sent**: Wednesday, August 31, 2011 08:36 AM
**To**: Abedin, Huma
**Subject**: Re: Report: Philippines lashes out at ex-US envoy (AP)

Where are you? When would be a good time to talk?

Sent from my iPad

On Aug 31, 2011, at 7:28 AM, "Abedin, Huma" <AbedinH@state.gov> wrote:

**From**: OpsNewsTicker
**Sent**: Tuesday, August 30, 2011 11:14 PM
**To**: NEWS-EAP; NEWS-WikiLeaks; NEWS-Mahogany; A Front Special Assistants
**Cc**: SES-O
**Subject**: Report: Philippines lashes out at ex-US envoy (AP)

MANILA (AP) - The Philippine foreign chief is quoted as calling the former U.S. ambassador to Manila "a dismal failure" over her leaked comments criticizing late democracy icon Corazon Aquino.

The Philippine Daily Inquirer published a 2009 embassy cable from whistle-blower WikiLeaks that quoted former Ambassador Kristie Kenney as saying Aquino's credibility as a moral crusader was tarnished because she associated herself with ousted President Joseph Estrada in protest movements against then-leader Gloria Macapagal Arroyo.

Aquino, the mother of current President Benigno Aquino III, died of cancer in 2009.

Foreign Secretary Albert del Rosario told Wednesday's Inquirer that unlike her predecessors, Kenney was "a dismal failure in helping the Filipinos defend our democracy."

*NewsTickers alert senior Department officials to breaking news. This item appears as it did in its original publication and does not contain analysis or commentary by Department sources.*

PR_RIM_MESSAGE_SUBMISSION_ID:

B7(E)

C06859804 USCA Case #22-5038 Document #1983526 Filed 01/08/2021 Page 62 of 63
UNCLASSIFIED U.S. Department of State Case No. F-2020-00151 Doc No. C06859804 Date: 01/08/2020

---

PR_RIM_PAGER_TX_FLAG:              true


PR_RIM_INTERNET_MESSAGE_ID:        [                              ]        B7(E)


PR_RIM_MSG_FOLDER_ID:              -5


PR_RIM_MSG_REF_ID:                 1846232254


PR_RIM_MSG_ON_DEVICE_3_6:          true


PR_RIM_MSG_STATUS:                 1

## **CERTIFICATE OF SERVICE**

I hereby certify that the attached Plaintiff-Respondent Judicial Watch, Inc.'s Response to Petition for Writ of Mandamus was electronically filed with the Clerk of the United States Court of Appeals for the District of Columbia Circuit by using the Appellate CM/ECF system on April 3, 2020.

Participants in the case are registered CM/ECF users and service will be accomplished by the Appellate CM/ECF system.


/s/ *Ramona R. Cotca*
Ramona R. Cotca

*Counsel for Respondent*
Judicial Watch, Inc.